**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SHERRIE BURNS, Individually and as Administratrix of the Estate of Matthew J. Burns, deceased,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **NO. 3:13-cv-974** **JUDGE CRENSHAW** |
| **v.** | ) ) | |
| **ROBERTSON COUNTY, TENNESSEE, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

<u>**MEMORANDUM OPINION**</u>

Matthew J. Burns committed suicide in the Robertson County Detention Facility (RCDF). His mother, Sherri Burns, brings this case individually and as the Administratrix of her son's estate alleging violations of the Fourteenth Amendment to the Constitution. Specifically, Ms. Burns against Robertson County, Tennessee and others, alleging that RCDF's customs and policies regarding identification and treatment of detainees who are suicidal constitutes deliberate indifference to her son's serious mental health care needs to prevent his suicide. Defendants have moved for summary judgment on all claims. For the reasons that follow the Court finds disputed issues of material fact. Accordingly, Defendants' motion for summary judgment is **DENIED**.

I.      **Factual Background**

   A.  **Matthew Burns' Mental Health**

Mr. Burns enjoyed a job and close relationships with his mother, sister, and infant son. In his late teens or early 20s, he was in an accident. This led to his dependency on pain medications, which affected his mood and behavior. (Doc. No. 44 at 2-3.) During the same period, Mr. Burns

was forced to acknowledge that his father sexually molested him when he was a small child, and his relationship with his mother and sister deteriorated as a result. (Id. at 3.) His psychiatrist diagnosed him with severe depression and bipolar disorder. (Id.) In the year before he committed suicide in the RCDF, he received treatment at both a mental health facility and a detoxification facility. (Id.) Approximately five months before his death, he was hospitalized for an overdose of medication, which his family members believed to be a deliberate suicide attempt, although Mr. Burns denied suicidal intent. (Id.) In the months before his suicide, Mr. Burns was taking the drug "Trileptal" for his bipolar disorder and "Neurontin" for the severe pain he experienced from his accident. (Id.) In the weeks before his arrest, Mr. Burns's conduct had become increasingly unusual, and his family was concerned for his well-being. (Id.) Mr. Burns's abnormal behavior culminated in his robbing a bank. (Id.)

**B. RCDF's Treatment of Mr. Burns**

On the day the FBI arrested Mr. Burns for the bank robbery, Major Tony Crawford, Jail Administrator at RCDF, received three telephone calls from individuals relaying concerns that Mr. Burns was at risk for committing suicide. (Doc. No. 43 at 2.) At the time he received these calls, Major Crawford was not yet aware of whether agents with the United States Marshals Service would transport Mr. Burns to RCDF or to one of the other facilities that house federal pre-trial detainees. (Id.) The first call was from someone Major Crawford believes was affiliated with either the Sumner County Sherriff's Department or the White House Police Department, and that individual told Major Crawford that Mr. Burns's family was very concerned about him. (Id. at 2.) The second call was from one of the agents transporting Mr. Burns, relaying the concerns of Mr. Burns's family. (Id. at 2-3.) Major Crawford received these two telephone calls before noon. (Id.

at 3.) A third call came from Mr. Burns's federal public defender, who also relayed the family's concerns about Mr. Burns's mental health and risk of suicide.

After receiving the telephone calls, Major Crawford contacted Nurse Janie Russell, the medical team administrator, to relay the information from the telephone calls and to instruct her to ensure that Mr. Burns was screened immediately after being booked into the jail, rather than within the 24-hour time-frame typically employed for federal inmates. (Id.) Nurse Russell told Major Crawford that having Mr. Burns screened would not be a problem. (Id.) Major Crawford did not put anything in writing. When he left at 4:00 p.m. that day, Major Crawford was still unsure whether federal agents would bring Mr. Burns to the RCDF, but instructed the correctional officers at the booking desk to have medical staff screen all new federal detainees before they were assigned to a housing unit to ensure that Mr. Burns would be screened upon arrival. (Id. at 4.) The content of the telephone calls Major Crawford had received about concerns related to Mr. Burns's mental health issues or risk of suicide were never relayed to the licensed nurse practitioner (LPN), Elizabeth Chezem, who conducted Mr. Burns's medical screening later that night. (Id.) The Jail did not have a policy in place that provided that the information contained in telephone calls such as these were to be documented and transmitted to the LPN who conducted the medical screenings at the Jail during the night shift.

On September 14, 2012, federal agents brought Mr. Burns to RCDF at 6:00 p.m. Correctional staff placed him in a holding cell in the booking area to await booking and medical screening. (Id. at 5.) At 10:20 p.m., a correctional officer started the booking process, which included an initial medical screening. (Id.) Pursuant to normal procedure, Mr. Burns prepared and signed a "History and Physical Form," on which he wrote that he was taking medications called "Trileptal" and "Neurontin." (Doc. No. 45 at 68-69; 40-2 at 11.) Under the mental health section

of the form, Mr. Burns wrote "no" beside questions about whether he had been hospitalized for mental health issues, whether he had any "prior counseling/outpatient Mental Health Tx," whether he had ever attempted suicide, and whether he had recently considered committing suicide. (Id. at 68.) The RCDF medical screening process also required the booking officer to indicate whether Mr. Burns exhibited any signs of abnormal behavior and whether his behavior or appearance suggested the risk of suicide. (Id. at 70.) The officer wrote "no" beside these questions. (Id.) RCDF also required the officer to ask Mr. Burns whether he had ever been treated for a mental disorder or attempted suicide, and the officer wrote "no" next to those questions as well. (Id. at 70.) After this initial medical screening, Mr. Burns was returned to a holding cell to be further evaluated by medical staff. (Doc. No. 43 at 5.)

On the evening of September 14, 2012, Nurse Chezem, who worked the night shift, evaluated Mr. Burns. (Id. at 6.) Nurse Chezem is an employee of Southern Health Partners ("SHP"), a private company that contracts with RCDF to provide medical services to individuals detained at the Jail. (Id.) Nurse Chezem is a Licensed Practical Nurse ("LPN"), which required twelve months of study at a vocational school. (Doc. No. 40-2 at 5.) She was the only medical personnel at the Jail the night Mr. Burns arrived, although she had the ability to call a physician or "medical team administrator" with SHP by telephone if necessary. (Id. at 7.)

Nurse Chezem conducted a physical examination, administered a TB skin test, and reviewed the History and Physical screening form completed by Mr. Burns and the booking officer. (Doc. No. 42 at 6; 40-2 at 9-10.) She asked Mr. Burns if he had thoughts of suicide, and wrote on the form, based on his response, "no thoughts of suicide." (Doc. No. 45 at 69; 40-2 at 12.) The U.S. Marshals Service had previously completed another form that indicated Mr. Burns had a diagnosis of depression and bipolar disorder, but Nurse Chezem denies having seen that

form. (Doc. No. 40-2 at 14.) She was also never told about the three telephone calls Major Crawford had received about family members' concerns about Mr. Burns's mental health and risk of suicide. Following Nurse Chezem's physical examination, Mr. Burns was placed back in a holding cell and eventually assigned to a cell in the general population. (Doc. No. 43 at 7.) She placed the medical forms in Mr. Burns's chart and then into a file for the doctor to evaluate when he came in for his weekly rounds. Mr. Burns committed suicide two days later, before the doctor came in for his weekly visit. (Doc. No. 40-2 at 10, 12.) Nurse Chezem was the only medically-trained person who ever screened Mr. Burns for mental health issues. (Doc. No. 45 at 5-6.) Mr. Burns received no care for his mental health issues. RCDF did not administer any medications to him, either for his pain or for his bipolar disorder.

Although Mr. Burns had indicated on the History and Physical form that he took Trileptal and Neurontin, Nurse Chezem had no knowledge about the purpose of those medications, their side effects, or the risks of abruptly ending the medications. Nurse Chezem made no effort to obtain further information about the medications. (Doc. No. 40-2 at 15-17, 19; 45 at 6, 68-70.) Trileptal is routinely prescribed for various mental health disorders, including bipolar disorder, with which Mr. Burns had been diagnosed. These medications are both anti-seizure medications, and both are known to increase the risk of suicide. (Doc. No. 44 at 3; 45 at 66-67, 71-73.) Abrupt cessation of these medications also increase the risk of suicide. These risks can be readily verified in official and unofficial medical publications available on the internet. (Doc. No. 45 at 62-67, 71-73.) Because Nurse Chezem did not inquire about the purposes of the medications, did not receive information about the family members' concerns about Mr. Burns's mental health, and did not see the form that indicated that he was bipolar, the only basis for her determination that Mr. Burns posed no suicide risk was his own statement to her denying any history of suicide attempts or

current suicidal ideation and her observation of his demeanor. (Id.) Indeed, Nurse Chezem was surprised Mr. Burns had committed suicide because he had not indicated to her that he had any suicidal thoughts. (Doc. No. 40-2 at 8-9, 16.)

On the afternoon of September 16, 2012, after being alerted by inmates that Mr. Burns was injured, correctional officers went to Mr. Burns's cell and found him on the floor, unresponsive. (Doc. No. 43 at 8.) The officers, and then a nurse, performed chest compressions on Mr. Burns. Emergency Medical Service arrived and transported him to NorthCrest Medical Center, from which Mr. Burns was transported to Vanderbilt University Medical Center. (Id.) Soon after arriving at Vanderbilt, Mr. Burns's attending physician pronounced him dead. (Id. at 9.)

### C. Robertson County's Policies and Practices on Mental Health Services and Suicide Prevention

On July 13, 2010, over two years prior to Mr. Burns's death, the Civil Rights Division of the United States Department of Justice (DOJ) notified Robertson County ("the County") of its intention to conduct an investigation of the conditions at the RDCF regarding its provision of nutrition and medical care. (Doc. No. 45 at 13-14.) The United States Attorney for the Middle District of Tennessee requested that the DOJ conduct such an investigation after receiving complaints from prisoners regarding the RCDF's failure to provide adequate nutrition and medical care. (Id. at 13.)

On August 11, 2011, the DOJ issued its written report, which, in part, stated as follows:

> While we found RCDF's practices with respect to nutrition, medical care, and environmental health and safety adequate or minimally adequate to comply with the Constitution, we found a pattern or practice of constitutional violations in RCDF's provision of mental health care. Specifically, RCDF's mental health practices place prisoners at a substantial and unreasonable risk of serious harm.

(Id. at 13.) The DOJ's report contained a "Summary of Findings and Conclusions," which included the following:

We have concluded that Robertson County ("the County") fails to provide mental health care to prisoners at RCDF in violation of the Fourteenth Amendment to the Constitution. Addressing these deficiencies should be RCDF's highest priority, as we believe that these lapses, if not corrected, have a strong likelihood of resulting in unnecessary injury and/or loss of life. Our specific findings of practices that do not comport with the requirements of the Constitution include:

- RCDF fails to protect prisoners from harm by permitting Licensed Practical Nurses ("LPNs")—individuals with little or no mental health training—to independently manage suicide precautions. The Constitution requires the Jail to provide prisoners with mental health needs with access to medical personnel who are qualified to diagnose and treat mental illness.

- RCDF fails to provide prisoners with serious mental illnesses with timely and competent mental health care. Specifically, (a) prisoners with chronic mental illnesses who are not capable of requesting mental health care are effectively denied treatment; (b) prisoners who request mental health care experience delays that violate constitutional standards; and (c) nurses are responsible for providing mental health care beyond their training and qualifications.

(Id. at 14.)

The report elaborated as follows:

- Presently, RCDF's sole physician is the only RCDF staff person qualified based on his training to conduct [ ] a reasoned assessment [or evaluation of the patient's suicide risk]. He is only onsite two hours each week and there is no psychiatrist on staff. Despite his limited time onsite, the physician acts as the Medical Director and is responsible for overseeing RCDF's entire clinical operation and for providing direct patient care for prisoners with medical or mental health care needs. To compensate for the lack of onsite physician time, the nursing staff provide clinical care that exceeds their licensure and training. RCDF's policies recognize that LPNs are not qualified or trained to independently make a reasoned assessment or evaluation of a prisoner's suicide risk.

- SHP policies reflect the need for a psychiatric provider at RCDF. For example, the Chronic Care Protocols state that after the medical staff and psychiatric nurse screen an inmate, "a referral may be made to see the Psychiatrist."

- RCDF's use of LPNs to make determinations regarding suicide precautions deviates from minimum constitutional requirements, RCDF's own policies, medical community practice, and the recommended guidelines of the National Committee for Correctional Health Care ("NCCHC"), and ultimately places prisoners at risk of serious harm. See Ramos v. Lamm, 639 F.2d 559, 576 (10th Cir. 1980) (finding that prison officials failed to provide constitutionally adequate medical care where non-physician medical staff were "being used as 'physician's

substitutes' and . . . being forced to make decisions and perform services for which they are neither trained nor qualified.").

- The physician and psychiatric nurse have little or no involvement in the management of suicide precautions.

- Mental health services at RCDF are primarily provided at the request of the prisoners. As a result, prisoners who are too ill to write a request for an appointment are, in effect, denied constitutionally adequate mental health care. See Casey v. Lewis, 834 F. Supp. 1477, 1550 (D. Ariz. 1993) (finding prison officials deliberately indifferent where "severely mentally ill inmates cannot make their needs known to mental health staff.". . . This practice places seriously mentally ill prisoners at considerable risk of harm, including decompensation.

- RCDF's mental health care system fails to provide timely treatment in violation of the Constitution. See LeMarbe v. Wisneski, 266 F.3d 429, 439 (6th Cir. 2001) ("[A] deliberately indifferent delay in giving or obtaining treatment may also amount to a violation under the Eighth Amendment. Even those prisoners who are able to request mental health services must wait significant periods of time before seeing the psychiatric nurse. The psychiatric nurse works at the facility one day per week for six to eight hours and essentially acts as the sole provider of mental health care to RCDF prisoners. Our review revealed that, on average, it takes approximately two to three weeks for the psychiatric nurse to respond to a prisoner referral. . . . [Even short delays for mental health care] deny prisoners access to medical care when the need is urgent. See, e.g., Fitzke v. Shappell, 468 F.2d 1072, 1076-77 (6th Cir. 1972 (delay of 12-17 hours in receiving treatment where circumstances indicated prompt need for medical attention stated a cause of action for denial of medical care).

- RCDF's practice of permitting nurses who are not trained and qualified to provide mental health care to manage psychotropic medications and treat prisoners with serious mental health needs violates the Constitution and generally accepted practices. See, e.g., Inmates of Allegheny Cty.] Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)]; Balla [v. Idaho State Bd. of Corr., 595 F. Supp. 1558, 1577 (D. Idaho 1984]) (finding that "minimally adequate psychiatric care" includes adequate coverage by a psychiatrist "to provide treatment to those inmates capable of deriving benefit").

- The "appropriate supervision and periodic evaluation" of prisoners on psychotropic medications is "constitutional minima . . . specific to mental health care." Madrid v. Gomez, 889 F. Supp. 1146, 1258 (N.D. Cal. 1995). RCDF prisoners are being treated with anti-psychotics and major mood stabilizers. Yet, the physician does not consistently evaluate prisoners on psychotropic medications, nor does he review the prescribed psychotropic medications to ensure their appropriateness and to prevent negative interactions with other medications. Instead, the psychiatric nurse

essentially prescribes and manages medications for patients with mental conditions, responsibilities that are beyond the scope of a nurse's training.

(Id. at 17-22.)

The DOJ report is replete with citations to legal authority to support its detailed analysis of the constitutional deficiencies in RCDF's policies and procedures on providing mental health care to detainees, such as Mr. Burns. As it pertains to inmates with suicidal tendencies, the DOJ report explains:

> The Constitution protects prisoners not only against ongoing harms, but also against the risk of future harm. Helling v. McKinney, 509 U.S. 25, 33 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition . . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."). Conditions posing a substantial risk of serious harm to prisoners therefore violate the Constitution, even if no prisoner has suffered actual harm at the time the violation is found. See Farmer, 511 U.S. at 845-47; Helling, 509 U.S. at 35 (finding that risk of future harm to prisoner's health stated a cause of action under the Eighth Amendment); Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 899 (6th Cir. 2004 (noting that the Constitution "does not require actual harm to be suffered"). The Supreme Court has clearly stated that "a remedy for unsafe conditions need not await a tragic event." Helling, 509 U.S. at 33.
>
> ***
>
> Prisoners have an "established right to medical attention once . . . prisoner[s'] suicidal tendencies are known" to prison officials. Comstock v. McCary, 273 F.3d 693, 711 (6th Cir. 2002). Medical attention provided solely by nurses who are not qualified and trained to treat prisoners' psychiatric needs is not sufficient to meet constitutional standards. Rather, prisoners with psychiatric needs have a right to "reasonable access to medical personnel qualified to diagnose and treat" mental illness. Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (emphasis added). RCDF violates this basic tenet by permitting its LPNs—individuals with little or no mental health training—to both place prisoners on and remove them from suicide watch.
>
> [The Constitution requires] that, at a minimum, correctional mental health programs must include "a basic program for the identification, treatment, and supervision of inmates with suicidal tendencies." Ruiz v. Estelle, 403 F. Supp. 1265, 1339 (S.D. Tex. 1980), aff'd in part and rev'd in part on other grounds, 679 F.2d 1115 (5th Cir. 1982); see SHP Suicide Prevention Policy (requiring staggered checks every 10-15 minutes); see also, Lindsay M. Hayes, Guide to Developing and Revising Suicide Prevention Protocols Within Jails and Prisons, Nat'l Ctr. on

Insts. & Alternatives 5 (2011) (recommending that a prisoner who is actively suicidal should be observed "on a continuous, uninterrupted basis," and a prisoner who is "not actively suicidal, but expresses suicidal ideation . . . and/or has a recent prior history of self-destructive behavior" should be observed "at staggered intervals not to exceed every 10 minutes (e.g., 5, 10, 7 minutes)).

(Doc. No. 45 at 16-17, 19.)

In light of the deficiencies identified in the report, the DOJ requested that the County "promptly implement," among others, the following "minimum remedial measures":

- [E]nsure that those prisoners identified as potentially suicidal are on constant watch until they receive their mental health assessment.
- Develop more defined referral parameters to ensure that prisoners with mental health needs are referred to the physician. Intake staff and nurses must be provided with clear guidance regarding which prisoners should be referred to the physician and how quickly that referral should take place. These guidelines should require an immediate referral for emergent issues, a referral within 24 hours when an expedited evaluation is necessary, and a referral within 72 hours for a routine evaluation.

- Enhance communication between custodial and medical staff and implement policies and procedures that provide for the timely treatment and regular monitoring of prisoners on suicide watch.

- Institute a chronic care program to address the needs of prisoners with serious mental illnesses. . . . Basic services must include, at a minimum:

  1. Identification and referral of inmates with mental health needs;
  2. Crisis intervention services;
  3. Psychotropic medication management, when indicated;
  4. Individual counseling, group counseling, psychosocial/psycho-educational programs; and
  5. Treatment documentation and follow up.

(Id. at 28-29.)

Tragically, at the time Mr. Burns committed suicide on September 16, 2012, the County had implemented no written policy changes after the DOJ's August 11, 2011 report. Just before the report was issued, on August 3, 2011, the County had approved a Suicide Prevention Policy, presumably in anticipation of the forthcoming report, which describes the screening process Nurse

Chezem performed on Mr. Burns, namely asking the inmate if he has ever attempted suicide or currently has suicidal feelings, and only referring the inmate to the medical staff if the inmate's response to one or both of those questions is affirmative (Doc. No. 47-2 at 2-3.) The other written policy changes identified by the County are sadly dated after Mr. Burns's death. (Doc. No. 45 at 8-9; 47-2 at 4-32.)

On April 26, 2013, the DOJ filed in this District a lawsuit against Robertson County, Tennessee, based on alleged violations of the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. §§ 1997 *et seq.*, seeking injunctive relief. (Case No. 3:13-cv-392.) On April 30, 2013, the Court entered the parties' settlement agreement, which obligated the County to make numerous changes to its policies related to mental health treatment to inmates with suicidal tendencies, including, as relevant here, the following provisions:

- Implement a suicide screening instrument that includes, among other things, consideration of prior mental illness treatment and medication history.

- Conduct appropriate mental health assessments that include an assessment of a diagnosis such as bipolar disorder.

- Ensure that all mental health care staff within the Jail have access to critical information for prisoners on suicide precautions.

- Ensure that all prisoners are appropriately screened for mental illness using an appropriately validated screening instrument.

- Ensure that treatment plans adequately address prisoners' serious mental health needs and that the plans contain interventions specifically tailored to the prisoners' diagnoses and problems.

- Ensure adequate on-site psychiatric coverage for prisoners' serious mental health needs and ensure that psychiatrists see such prisoners in a timely manner.

- Ensure that prisoners have proper diagnoses made by a psychiatrist, psychologist or medical doctor for each psychotropic medication they receive.

- Ensure a medication continuity system so that incoming prisoners receive psychotropic medications for serious mental health needs in a timely manner, as medically appropriate.

- Ensure that individuals receiving psychotropic medication are adequately monitored for potential negative side-effects of such medications.

(Doc. No. 45 at 43-49.)  These changes came too late to save Mr. Burns.

## II.     Legal Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Pennington v. State Farm Mut. Automobile Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009).  The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).  "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party's case.'" Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If the moving party is able to meet this initial burden, the non-moving party must then "set forth the specific facts showing that there is a genuine issue for trial." Id. (quoting Fed. R. Civ. P. 56(e)).

## III.    Legal Analysis

Plaintiff brings this action under 42 U.S.C. § 1983 against Robertson County, Sherriff Bill Holt, and Major Tony Crawford, the Jail Administrator. To succeed on a claim for a violation of § 1983, a plaintiff must establish that he was denied a constitutional right and that the deprivation was caused by a defendant acting under color of state law.[1] Carl v. Muskegon Cty., 763 F.3d 592, 595 (6th Cir. 2014).

---

[1] Robertson County argues that it cannot be liable under § 1983 because the alleged violation was committed by Nurse Chezem, who was an employee of the private company the County contracted with to provide medical services, not the County itself. However, Robinson County "may not escape § 1983 liability by

Plaintiff has voluntarily dismissed her claims against Holt and Crawford in their individual capacities, and only pursues claims against these individuals in their official capacities. (Doc. No. 42 at 32.) A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity employing him. Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Matthews v. Jones, 35 F.3d 1046, 1049 (6th Cir. 1994). Thus, Plaintiff's only claims are, effectively, only against Robertson County.

Municipalities are "persons" for purposes of § 1983 liability. Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). However, municipalities are only responsible for "their *own* illegal acts." Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986) (emphasis in original). "Municipal liability must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff; '*respondeat superior* or vicarious liability will not attach under § 1983.'" Gray v. City of Detroit, 399 F.3d 612, 617 (6th Cir. 2005) (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)); Monell, 436 U.S. at 691. A plaintiff seeking to impose liability under § 1983 must demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree

---

contracting out or delegating its obligation to provide medical care to inmates." Carl v. Muskegon Cty., 763 F.3d 592, 596 (6th Cir. 2014) (citing Estelle, 429 U.S. at 104. The government has the "affirmative obligation to provide adequate medical care" to those in its jails. West v. Atkins, 487 U.S. 42, 56 (1988). "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their constitutional rights." Id. The Sixth Circuit has held that private entities and medical providers serving inmate populations are state actors for purposes of § 1983. Carl, 763 F.3d at 596 (citing cases). Thus, that Robertson County contracted with SHP to provide for the medical needs of pretrial detainees in its jails does not allow it to avoid liability under § 1983.

of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id.; see also City of Canton v. Harris, 489 U.S. 378, 385 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

The Sixth Circuit has articulated the proper analysis for municipal liability under § 1983 in the specific context of an inmate's suicide:

> A municipality may be liable under § 1983 where the risks from its decision not to train its officers were "so obvious" as to constitute deliberate indifference to the rights of its citizens. As applied to suicide claims, the case law imposes a duty on the part of municipalities to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable. Where such a risk is clear, the municipality has a duty to take reasonable steps to prevent the suicide.

Gray v. City of Detroit, 399 F.3d 612, 618 (6th Cir. 2005).

**A. Constitutional Right**

While the Eighth Amendment does not apply to pretrial detainees, the Due Process Clause of the Fourteenth Amendment provides them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment. Gray, 399 F.3d at 615-16. A detainee's constitutional rights are violated "when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001). A medical professional's negligence in diagnosing or treating a medical condition does not violate the Constitution. See Estelle v. Gamble, 429 U.S. 97, 106 (1976) (Eighth Amendment context). Only "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" rise to the level of constitutional violation See id. In this Circuit, providing "grossly inadequate medical care" to an involuntary detainee may amount to deliberate indifference. Miller v. Calhoun Cty., 408 F.3d 803, 819 (6th Cir. 2005). "Grossly inadequate

medical care is medical care that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id.

A constitutional claim for deliberate indifference contains both an objective and a subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. Id. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Blackmore v. Kalamazoo Cty., 390 F.3d 890, 897 (6th Cir. 2004). Mental illness that places an individual at risk of committing suicide satisfies the objective component of a deliberate indifference claim. See Comstock v. McCrary, 273 F.3d 693, 711 (6th Cir. 2001) (noting that Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999) had recognized "implicitly that suicidal condition is serious medical condition which requires medical attention). The subjective component, in contrast, requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." Comstock, 273 F.3d at 703 (citing Farmer, 511 U.S. at 837).

Here, there are no remaining claims against individual officials, so the Court does not consider what any particular county official subjectively perceived, but instead applies the "deliberate indifference" standard to the County. Perez v. Oakland Cty., 466 F.3d 416, 430-31 (6th Cir. 2006) (citing Gray v. City of Detroit, 399 F.3d 612, 616–18 (6th Cir. 2005); Barber v. City of Salem, 953 F.2d 232, 238–40 (6th Cir.1992)). "As applied to suicide claims, the case law imposes a duty on the part of municipalities to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable. Where such a risk is clear, the municipality has a duty to take reasonable steps

to prevent the suicide." <u>Gray</u>, 399 F.3d at 618. "'[D]eliberate indifference' is a stringent standard

of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." <u>Perez</u>, 466 F.3d at 330-31 (quoting <u>Board of County Comm'rs of Bryan County v. Brown</u>,

520 U.S. at 410)).

The County cites several cases for the proposition that there is no clearly established right

for a particular inmate to be protected from committing suicide. (Doc. No. 40 at 12-13.) For

example, the County quotes the following from the Sixth Circuit's opinion in <u>Gray</u>, 399 F.3d at

612:

> [T]here is no general constitutional right of detainees to receive suicide screenings
> or to be placed in suicide safe facilities, unless the detainee has somehow
> demonstrated a strong likelihood of committing suicide. <u>See</u> <u>Danese v. Asman</u>, 875
> F.2d 1239, 1244 (6th Cir.1989); <u>Crocker v. County of Macomb</u>, 119 Fed. App'x.
> 718, 724 (6th Cir. 2005) (unpublished) (finding no change in the law since <u>Danese</u>
> was decided in 1989). As one commentator put it, "[a] right to screening for suicidal
> propensities or tendencies arises when it is obvious that an inmate has such
> tendency or propensity" (emphasis added)—in other words, when the suicide is
> clearly foreseeable. George J. Franks, <u>The Conundrum of Federal Jail Suicide Case</u>
> <u>Law Under Section 1983 and Its Double Bind for Jail Administrators</u>, 17 Law &
> Psychol. Rev. 117, 125 (1993).

<u>Id.</u> at 616. However, the Sixth Circuit "has consistently recognized a prisoner's established right

to medical attention *once the prisoner's suicidal tendencies are known*." <u>Comstock v. McCrary</u>,

273 F.3d 693, 711 (6th Cir. 2001) (emphasis added) (citing cases).

The trier of fact may find that the County was aware of Mr. Burns's suicidal tendencies, as

the result of three telephone calls made to the Jail by his family members and attorney, within

hours of his arrival. As a result, a trier of fact could conclude that the County was constitutionally

obligated to provide him with medical attention that was not "grossly inadequate," <u>Miller v.</u>

<u>Calhoun Cty.</u>, 408 F.3d 803, 819 (6th Cir. 2005), and that it failed to meet that standard.

The trier of fact may conclude that the County was also aware, or should have been aware, of "obvious risks of suicide that [were] foreseeable," which it failed to recognize, "or at least [should] not ignore." Gray, 399 F.3d at 618. If the County was unaware of the risk of inmates' suicides created by its policies and customs before the DOJ's investigation, the DOJ's report made it as clear as water from a snow top mountain by providing explicit and detailed analysis about the ways in which the County's mental health care was deficient as well as the measures the County needed to implement immediately in order to avoid that risk.

The failures that a trier of fact may find caused the deprivation of Mr. Burns's due process rights and ultimately led to his death include: failure to have a reliable procedure for relaying the mental health concerns of a detainee's family members and attorney to those providing mental health care in the Jail; failure to have an adequately trained professional conducting medical intakes who could properly identify mental health issues without relying solely on an inmate's self-reporting; failure to have an appropriately trained professional review the information collected by an LPN in a timely manner after a detainee enters the facility; and failure to ensure that detainees continue to receive the psychotropic medications they have been prescribed by a mental health professional in the community.

The record before this Court would support the finding that the County's policies and customs on the provision of medical care to detainees with suicidal indications was "grossly incompetent" or "inadequate" as to amount to deliberate indifference. Miller v. Calhoun Cty., 408 F.3d 803, 819 (6th Cir. 2005). Some of the facts a jury might find include the County's reliance on the same LPN to screen new detainees that the DOJ had described over a year earlier as lacking the proper qualifications to conduct suicide or other mental health assessments. Nurse Chezem claims she had not seen the form that indicated that Mr. Burns was bipolar, but also indicates that

she had little knowledge of the significance of that diagnosis. She also had no knowledge of the purpose of the medications Mr. Burns was taking, the risks associated with taking the medications individuals and in combination, or the risks of abruptly ending the medications. She neither independently investigated those issues nor alerted her medical supervisors about Mr. Burns's medications. There is no evidence in the record that she was trained to do differently or that she failed to follow procedures in place that would have avoided this situation. Indeed, she reviewed the screening forms that Mr. Burns and a correctional officer had completed and completed the one she was required to complete. She complied with the suicide prevention policy that was in place. The only supervision in place to review the LPN's screening was a once-a week physician visit to the facility to review the files. Mr. Burns's suicide within two days of entering the Jail tragically demonstrates that the supervision in place to review the LPN's assessment of the medical needs of recent detainees was inadequate and untimely. A jury could find that the policies and practices in place were so inadequate and incompetent as to shock the conscience.

A trier of fact could also determine that, if the County had heeded the DOJ's requested changes to its policies and practices, Mr. Burns might well be alive today. If not, at least the County would have met its constitutional "duty to take reasonable steps to prevent [his] suicide." Gray v. City of Detroit, 399 F.3d 612, 618 (6th Cir. 2005). Although "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," Perez, 466 F.3d at 330-31, and the Sixth Circuit has noted that "[v]ery few cases have upheld municipality liability for the suicide of a pre-trial detainee," Gray, 399 F.3d at 618, the Court concludes that a trier of fact here could find that the Plaintiff has met this standard.

**B. Moving Force**

Plaintiff has presented sufficient evidence from which a jury could conclude that the County's "deliberate conduct" was the "moving force" behind Mr. Burns's death. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997). The DOJ need not issue a detailed report about a jail's unconstitutional provision of medical care for a plaintiff to prevail on a deliberate indifference claim. Yet here, the County had the remarkable benefit of an eighteen-month investigation by the DOJ and a report setting forth in great detail what the County needed to do to bring its mental health care for detainees into constitutional compliance. A jury could find that the County did not take sufficient steps to implement the changes requested by the DOJ, which were specifically designed to prevent detainees from harming themselves. Over a year after the DOJ's report, the County had done little to implement the recommended changes.

**C. Similar Cases**

This Court's decision denying summary judgment is in accord with that of other courts that have found relevant a county's awareness of the unconstitutionality of its provision of medical or mental health care to inmates because of a DOJ report. For example, in Shepherd v. Dallas County, a pretrial detainee obtained a jury verdict of $890,336 after he suffered a stroke and became permanently disabled due to the failure of the Dallas County Jail to administer the medications he needed to manage his chronic hypertension. 591 F.3d 445,449 (5th Cir. 2009). The Fifth Circuit found that the jury's verdict was supported by sufficient evidence, because the plaintiff had shown that the jail's failure "was not an unintended error but the predictable result of a *de facto* policy that denied inmates adequate care for chronic conditions." Id. at 449, 456. The court also concluded that the district court did not err by admitting a DOJ report that had concluded that the jail was operating in violation of inmates' constitutional right to adequate medical care, by, among other

things, failing to adequately identify inmates' health needs through appropriate intake screening, failing to timely and consistently administer treatment and medications, and failing to assess and monitor inmates' chronic illnesses. <u>Id.</u> at 451, 456-57 ("The findings in the DOJ report were undoubtedly prejudicial to the County's cause, but they were probative as well.").

In <u>Shorter v. Baca</u>, a district court denied a motion for summary judgment made by a county, sheriff, and deputies on a pretrial detainee's claims that the jail had violated her constitutional rights to adequate medical care, sanitary living conditions, adequate nutrition, clean clothes, exercise, and right to be free of overly invasive searches. 101 F. Supp. 3d 876 (C.D. Cal. 2015). The court held that a reasonable juror could find, given the lack of training and procedures identified in a letter from the DOJ and a report issued by a county committee, "that the County knew, and simply did not care" about the alleged constitutional violations. <u>Id.</u> at 907. The court further held that the county report and DOJ investigation demonstrated that the sheriff "was aware of unconstitutional conditions in his jails and failed to take action to ensure that policies were implemented to prevent the mistreatment of prisoners." <u>Id.</u> at 908.

Finally, in <u>Jones v. Gusman</u>, detainees sued a sheriff alleging unconstitutional deficiencies in medical and mental health care among other issues in the city's jails. 296 F.R.D. 416 (E.D. La. 2013). The United States, which had issued a letter to the city finding constitutional violations in these areas two years earlier, intervened. The district court eloquently expressed the importance of constitutional protections for incarcerated individuals:

> The federal rights at issue here, particularly with respect to the Constitution, establish minimum standards rather than ideals to which a correctional institution may aspire. These minimum standards are nonnegotiable. The Constitution guarantees that inmates, including convicted inmates and pretrial detainees who are presumed innocent, receive certain minimum levels of medical care and mental health care.

Id. at 469.

A trier of fact in this case could conclude that Robertson County treated the DOJ's attempt to warn it about its unconstitutional of mental health services as aspirational rather than constitutionally required minimum standards. The Court finds these cases, which arose in very similar contexts, with counties failing to heed a DOJ report detailing unconstitutional conditions in their jails, to be instructive in resolving the pending motion for summary judgment by Robertson County. Indeed, given the similarities between these cases and this one, Robertson County would be well served to at least consider them and the attendant risks as this case goes forward.

## IV. Conclusion

The record before the Court, when viewed in the light most favorable to the Plaintiff, shows that a jury could find that Robertson County was deliberately indifferent to Mr. Burns's medical needs and that its policies and practices caused Mr. Burns's death. The County's motion to for summary judgment (Doc. No. 32) is **DENIED**.

The Court will enter an appropriate order.

_____

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE